**Wadelmiro ARROYO, Defendant, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 5261.

United States Court of Appeals First Circuit.

Heard Feb. 7, 1958.

Decided June 25, 1958.

Rafael V. Perez-Marchand, Rio Piedras, P. R., with whom Carlos A. Romero Barcelo and Miguel E. Herrero Frank, Rio Piedras, P. R., were on the brief, for appellant.

Ruben Rodriguez Antongiorgi, U. S. Atty., San Juan, P. R., with whom John M. Gallagher, Atty., Dept. of Justice, Washington, D. C., was on the brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and STALEY, Circuit Judges.

WOODBURY, Circuit Judge.

The appellant was indicted, tried by jury on his plea of not guilty, convicted and sentenced in the court below for receiving money from an employer in violation of § 302(b) and (d) of the Labor Management Relations Act, 1947, 61 Stat. 157, 29 U.S.C.A. § 186(b) and (d) quoted in the margin,[1] with so much of subsection (c) as has any application here.

The Government introduced evidence at the trial to show that on February 21, 1953, Central Mercedita, Inc., and Puerto Rican Sugar Refinery, Inc., allied corporations engaged in Puerto Rico in the production of sugar for movement in interstate commerce, executed a collective bargaining agreement for the years 1953 through 1955 with the Union de Trabajadores de Factoria, Refineria y Ramos Anexas de la Industrial Azucarera, Local 1781, Afiliada a la International Longshoremen's Association (hereinafter for brevity referred to as the Union), as the duly certified representative of appropriate units of their employees and that the agreement was negotiated and executed on behalf of the Union by the appellant as the Union's president and principal negotiator. Article 6 of the agreement provided that the employers would contribute equally to a welfare fund of $15,-000 to be used to furnish medical aid, hospitalization, etc., for the employees of the employers and their families and dependents which was to be administered by a committee to be appointed by agree-

1. "(b) It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value.

"(c) The provisions of this section shall not be applicable * * * (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): * * *

"(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both."

ment of the parties. On the day the agreement was signed, or the day following, the evidence is conflicting, each employer gave the appellant its check in the amount of $7,500 payable to the Union, each check having a voucher attached showing that it covered the employer's contribution to the welfare fund established under the collective bargaining agreement.

On February 24, the appellant, instead of depositing the checks in the Banco de Ponce to the credit of the Union's welfare fund to be withdrawn by checks signed by him and counter signed by a representative of the employers, as had been the practice with respect to previous similar funds, used the checks endorsed by himself and the Union's secretary to open a new account in the name of the Union's welfare fund in the Ponce branch of the National City Bank. A week or so later the appellant gave the bank what purported to be a resolution of the Union giving him authority to draw against this account over his signature only, and subsequently, beginning on March 6, he made withdrawals from the account for his personal benefit, as for the purchase of an automobile. The employers protested as soon as they discovered what was afoot and on March 26, 1953, the bank closed out the account by giving the appellant a manager's check for the balance remaining on deposit of $9,812.89. The appellant deposited this check to the Union's general account in the Banco de Ponce, on which he was the only person authorized to draw, and he drew against it for his personal use and general purposes of the Union. There is no evidence that any part of either account was used for the welfare purposes specified in Article 6 of the collective bargaining agreement.

There can be no doubt that the two corporations involved, Central Mercedita, Inc., and Puerto Rican Sugar Refinery, Inc., are "employers" within the meaning of the statute. Nor can there be any doubt that the appellant was a "representative" of the employees of those employers as that term is defined in United States v. Ryan, 1956, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335. The basic question presented is whether the appellant can stand convicted on the facts outlined above.

The appellant contends that having accepted checks from the employers payable to the Union's welfare fund, and having deposited those checks in a bank to the credit of that fund, he cannot in reason be said to have "received" himself any "money or other thing of value" from the employers. He concedes that through the personal control he possessed over the welfare fund he not only could but did use it for his own personal expenses, but he says that while he may thereby have violated the local criminal law, the monies he received came from the Union, not from the employers. Thus he contended throughout the trial and contends here that the evidence of his misappropriations was not only irrelevant but also highly prejudicial and should have been excluded. The Government on the other hand contends, and the court below adopting the contention so charged the jury, that even though the checks were made payable to the Union's welfare fund and were so deposited, nevertheless, if by collusion with other Union officials or by more devious means, the appellant in fact possessed complete and sole control over the fund so that he might use all or part of it for his own personal benefit in violation of the collective bargaining agreement and the law, he "received" money from the employers in violation of the statute. We agree with the view of the Government and of the District Court.

One obvious purpose of subsection (b) of the statute is to discourage by the imposition of criminal sanctions representatives of employees from shaking down employers. But this is not its only purpose. The statute is not limited in its thrust to cases of extortion. By subsection (b), read with subsection (a) which imposes similar sanctions upon employers for paying or delivering, or agreeing to pay or deliver any money or other thing of value to any representative of his employees, Congress, in the words

of Chief Judge Learned Hand dissenting in United States v. Ryan, 2 Cir., 1955, 225 F.2d 417, 426, "wished to prevent employers from tampering with the loyalty of union officials, and disloyal union officials from levying tribute upon employers." This, however, is not all, for the statute read literally prevents even the creation of a relaxed and friendly atmosphere for collective bargaining by the device of gifts or presents passing from employers to the representatives of their employees. From its use of language it seems evident that Congress wished to assure collective bargaining at arms length except, of course, for a possible friendly atmosphere born of mutual trust and confidence.

To achieve this purpose subsections (a) and (b) of § 302 read broadly to make it illegal, with the five exceptions listed in subsection (c), "for any employer to offer, or any representative to accept, money or other thing of value." United States v. Ryan, 1956, 350 U.S. 299, 303, 76 S.Ct. 400, 404, 100 L.Ed. 335. "As the statute reads, it appears to be a criminal provision, *malum prohibitum*, which outlaws all payments, with stated exceptions, between employer and representative." Id., 350 U.S. 305, 76 S.Ct. 404. We may safely assume that Congress spoke in sweeping terms designedly in order to prevent circumvention of the statute by subtle and devious devices. And one of the devices for circumvention in the mind of Congress when it enacted the section was the creation of spurious union welfare funds. The legislative history clearly shows that "In 1946 Congress was disturbed by demands of certain unions that the employers contribute to 'welfare funds' which were in the sole control of the union or its officers and could be used as the individual officers saw fit." United States v. Ryan, supra, 350 U.S. 304, 76 S.Ct. 404. See, also, the legislative history cited and quoted at length in the same case in the Court of Appeals, 2 Cir., 1955, 225 F.2d 417, 422 et seq., and in United Marine Division, etc. v. Essex Transportation Co., 3 Cir., 1954, 216 F.2d 410, 412.

■ Moreover, the statute does not require mutuality of guilt for the conviction of either the employer or the representative of employees. An employer would be guilty under subsection (a) if he paid or delivered any money or other thing of value to a representative of employees even though the latter repudiated the gift by returning the money or thing tendered. Likewise a representative of employees would be guilty under subsection (b) if he received money or other thing of value from an employer unless the receipt were covered in the exceptions stated in subsection (c). Thus we are not here concerned with the employers' guilt. There is no occasion to express any opinion on their conduct. The question is whether the appellant "received" the checks on behalf of the Union for its welfare fund to be administered according to the terms of the collective bargaining agreement, or whether he accepted the checks for a bogus welfare fund, i. e. one over which he in fact had complete and sole control in violation of the collective bargaining agreement, for in that event he did not "receive" them under any of the circumstances permitted by subsection (c) of § 302 of the statute.

The jury answered this question in favor of the Government, as it might well have done on the basis of the evidence of the appellant's conduct in obtaining sole personal control over the fund and then in withdrawing from it for his own personal expenses soon after he deposited the checks in the Ponce branch of the National City Bank. The competency of the evidence of his withdrawals from the fund for his personal expenses to show his complete and sole control over the fund is too obvious to call for demonstration or the citation of authorities.

■ The appellant's challenge to the array of jurors on the ground that not a single prospective juror was a daily wage earner or member of the working class was properly denied because it came too late, and also because it was not in proper form and did not challenge the whole array but only the 56 persons drawn from it to serve as prospective jurors.

The appellant's other objections, insofar as not covered by what has already been said, have on consideration been found too insubstantial to call for discussion.

Judgment will be entered affirming the judgment of the District Court.